We'll hear argument now in the case of Edwards v. Jolliff-Blake. May it please the Court, the summary judgment should not have... Your Honor, wait to be called, please. I'm sorry. You have the full exchange of counsel. I'm sorry, Your Honor. Ms. Judge. Thank you, Your Honor. May it please the Court. Summary judgment should not have been granted to the defendant, City of Chicago, and the officers because there were disputes of material facts, there were things that were not told to the warrant judge, and there were credibility issues that should have been resolved by a jury. There are disputes between the police officers as to what happened. There are disputes between the police officer and the John Doe informant, not even getting to there being disputes between the plaintiff and the defendants. John Doe said he was under pressure to give up a drug house. He had been stopped, he had drug paraphernalia on him, and in his words he said, I knew I was screwed. He was dope sick and desperate, he needed his heroin, he wanted to get back on the streets. Officer Herrera confirmed that. He said this guy was in bad shape. He'd been up all night, his pupils were constricted, he was shaky and jittery, he was moving all over the place. Now, Officer Joliff-Blake said, no, he just walked in and gratuitously said, I want to turn in my cellar. Even if we credit it as a dispute, how is it material in light of what was presented in the complaint for the search warrant to the Cook County Court? Well, Judge Scudder, they should have told the judge that this John Doe informant was under pressure. There's no way the judge would have known that he had drug paraphernalia on him and he had a charge hanging over his head when he told them, oh, I can get you a drug house. The state judge knew he was a heroin user, so the fact that he had syringes on him, I mean, how's that material? How would it possibly surprise anybody? Well, the John Doe informant felt pressured. He said, I knew I was screwed. He had possibility of charges on him. Suppose it's true. What difference does it make? The warrant judge should have been told that, that he was under pressure and that he was in really bad shape when they talked to him. They waited a day before they took this informant to see the judge. When they saw him, he was in bad shape. And we do bring up credibility issues. We've given to you DVDs of his deposition. This man is a tragic case. The DVD shows that he's lethargic, incoherent, erratic, and he was in worse shape, we would contend, back in June of 2012 when he talked to the police. He was using 10 to 15 bags of heroin at that time. And we should have been allowed to argue that to the jury. Now, the district court brushed that aside and said, well, just because he's acting bizarre in his deposition doesn't mean he was acting bizarre at the time he was talking to the police. So we have— Well, we have evidence that the judge at least met with the John Doe informant face-to-face. We don't know much about what was said there. But that's a pretty important step in terms of corroboration. And you've got the problem here, of course, that there was a warrant that was issued on the basis of a hand-to-hand sale report. But in seeing John Doe's deposition, I thought he said several times, I told Officer Jolliffe Blake that I was buying heroin at Flournoy, not at the plaintiff's home on Keeler. Why isn't that alone enough to present a material issue of fact? We think it is. There was confusion about the address that was not told to the warrant judge. He said it's Flournoy, it's Carlop. The closest he ever said to saying it was Keeler is that it was one of the K streets. And there are eight K streets. I've named them in the brief. Eight K streets. Take him to the location and he'd say that is the house right there? Well, this is what happened. He was confused about the address. They pulled a picture off of the assessor's office. Now, they could have gone to the assessor's office and find out who's paying the taxes, who lives there. Nelson Edwards lived there for more than 40 years with his wife and with his family. Could you slow down a bit? We still have an echo problem. Okay. I'm sorry, Your Honor. I don't hear the echo, but, of course, that's a problem. So they pulled a photograph out. And when he was confused about the address, they pulled a photograph out and they said is this the house? They didn't pull out a series of photographs. They didn't give him the photograph for Lexington. You're right about that. You're right about that. But didn't they also put him in a car and take him out to the location and he said that house right there? They pulled up in front of the house and they said is that the house? And he said yes. When he said his deposition, I can't tell houses apart. They all look alike. Right. Right? Right. I thought if we take the officer's version of the basis for the search warrant, there's no case here, clearly. But the problem that I have with this is you may actually need to embrace John Doe as a credible witness because his account of what he told Joliff Blake is so different from what Joliff Blake has said and what's in the complaint. I would agree with that, Judge Hamilton. He said this was the first time I ever went to this house. But what Joliff Blake put in the affidavit that the warrant judge looked at was that he had been numerous times at the house, that Fred was running a drug operation from the basement. John Doe said that's the first time I ever went to the house. Joliff Blake said I've been working with this informant for months. The informant said I never saw these officers before in my life. I'm walking up the street and they saw me and they put me into their SUV and took me to the station. So some of this should have been communicated to the judge. And what was so distinctive about this house? He was pressured to say that he had a drug house. He had to get back on the streets. He was hurting for the drugs. He was desperate. He was afraid of getting charged. He was afraid of being thrown into a cell and not being able to get his heroin. And when the police said was this the house, he would have said anything. He would have said anything at that point. Now, they said three years later, they said that this dog pen, the dog pens were a distinguishing feature. That never came up before. It was not in the police reports. It's not in the affidavit. It's not in the search warrant. In their answers to requests to admit, they said that all the grounds for the probable cause are in the affidavit. We should be able to argue to the jury that the police who brought him to the depositions persuaded him that that was a distinguishing feature. But that should have been articulated in 2012, not in 2015. Let me ask you about the requests for admissions issue here. The case was originally before Judge Chang, correct? It was, yes. He was dealing with the issue about whether the officers, the officers had the wrong John Doe, right? Well, they switched, yeah. Under oath, correct? That's correct. And my understanding of the law is that when requests for admissions, or when admissions in response to requests are withdrawn or amended, that both versions remain admissible. Is that your understanding? It is. So what you've got, as I understand it, is Officer Joliffe Blake contradicting himself. Right. On even the identity of the informant who gave the information to support the search warrant, correct? That's correct, Your Honor. So I hope the city will address this, but in trials, I would routinely instruct juries that if a witness had been impeached by his own prior contradictory statements, for example, and they believed the witness had knowingly testified falsely about any significant matter, they were free to distrust that witness's testimony on anything. Why isn't that enough to get this to a jury? I think it is, Your Honor. And the timing of Joliffe Blake changing the identity of the John Doe is critical here. It was at the point that it was apparent that the district court judge was going to order the disclosure of the John Doe's name and require a deposition, that Joliffe Blake then said, oh, I'm so confused. And we did give you his DVDs, too. You could watch his DVDs. Slow down. Okay. Can I ask you about a couple of your other related claims? When Mr. Edwards tried to get into the house, he had some kind of physical encounter with one of the officers. Did he fall down? He was pushed back into a chair. He didn't fall down. And on the theory that the police should have realized they had the wrong place, when do you think? I have real trouble with that, if the warrant's valid. But when do you think the police were required to give up and abandon the search? According to Officer Herrera, they knew when they walked into the house this was not a drug house. They knew it was a family house. They saw the elderly and frail Nelson Edwards. They saw it wasn't in disarray. He gave several indicia that would have told them it was a drug house. They knew it wasn't a drug house. And Sergeant Sullins then said, let's give it the white blood treatment. I don't have experience on the streets of Chicago in drug enforcement. But police often get search warrants for stuff that's pretty well hidden. And I would think that if you found probable cause, even if you don't immediately find what you're looking for, that you can take reasonable measures to keep looking for where it might be hidden, right? In the matter of federal constitutional law and the boundaries of what police can do with a warrant. You're right. But Sergeant Sullins said at the beginning, give us the white glove treatment. He knew there was something wrong. It was like, let's pretend we're searching, but let's not do too much damage. Why would the Constitution require them to stop at that point, even if they had a touch of hesitation? They ended up having a dog alert. Now, I know your point is on the prescription pills. But didn't the plaintiff also indicate, look, I have some guns in the house. They're registered to be sure, but there are some guns in the house. He told them right where they were. They went and got them right away. And they called in and found out that they were legal. What authority do you have that they should just stop at that point in time, given that they have a warrant? The house didn't match up. The house didn't match up. The back gate was locked. There wouldn't have been access. When you add them all together, they should have said something's wrong. There was no back door leading to the basement. The biggest thing is the basement itself. John Doe said, we partied in the basement. I slept in the basement. The basement is a closet. It's a closet. There's no room to lie down. They would have known that, going back to Judge Hamilton's question, they would have known that when they walked in because they do protective sweep. They go through the whole house, protective sweep to see if there are people there, and then they have a canine go through the whole house before they search. So at that point, they should have said, this basement doesn't match up. Nothing matches up. And they also knew they were asking these people, who are you? Do you know Fred Sutton? They could have looked at mail. Something was not right at that point. And they spent two hours in the house with the family pleading. They said, look, you're in the wrong house. We don't know this guy. So at what point should they have stopped? Well, they should have been suspicious when they walked in the door, but then when they saw that it didn't match up, then they had to – it should have given them more than pause. And the fact that Herrera says, as Sergeant Sullen said right at the beginning, give us the white glove treatment, that means that he already knew that there was a problem there. So I think that they should have stopped it at that point. I do want to give myself time for rebuttal. I do want to speak to the Monell claim at some point, though. This case illustrates why Monell is so important, because if there had been a file for the John Doe informant, we wouldn't have had this confusion as to who he was and a switch around in the middle of the case as to who he was. We're not even convinced that the man who came to the deposition is the John Doe informant. He's just the person they brought to the deposition. So I'll speak more to Monell, but I do want to save some time for rebuttal. Thank you. Thank you, Ms. Geigler. Thank you. Mr. Huppert. May it please the Court. The district court properly granted summary judgment in favor of defendants on all of plaintiff's claims. To begin, summary judgment was proper on plaintiff's illegal search claim because probable cause supported the warrant. A judge's decision to issue a warrant is reviewed deferentially and will be upheld as long as there was a substantial basis for the probable cause determination. And when probable cause is based on an informant's tip, that tip is evaluated within the totality of the circumstances. Why don't we have just credibility problems all over the face of this? Given Officer Joliffe Blake's impeachment of himself with respect to sworn testimony about the identity of John Doe and the conflicts between John Doe's testimony and Officer Joliffe Blake's about what the informant told Joliffe Blake. Well, to take those in those two pieces, Your Honor, to begin with the request to admit and the confusion with the John Doe. Initially, you know, the officers explained that confusion because they said that after they explained it, they can explain that to the jury. We see cases all the time where witnesses, it takes them a while to get to the right story as far as they're concerned for their side of the case. But where you've got sworn testimony or admissions, they're all admissible and we let juries sort that out. Well, but here, Your Honor, the only question was whether they had identified the correct John Doe. And in the end, they did identify the John Doe. He was deposed. Three times he sat for depositions. He told them it was the house on Floranoi. No, at the start of his first deposition, he expressed some confusion about where the house was. He said, I think the house on Floranoi, but it's been years since I was over there. I'm not great with addresses. I could take you there. I took the officers to the correct address at the time. Later on in his depositions, he remembered that it was on the corner of Arlington and a K Street. He remembered that it was one of the K Streets that ran in that direction. So we've got several versions from John Doe himself, right? No, the John Doe in the end was clear that he believed this was the house. The answers at the end, right? The defense liked the answers where he wound up, right? In the beginning, he expressed some confusion years after the fact about the location. But in the end, he remembered what he told the officer, which was consistent with the officers. I've got to tell you, this just seems to me like a classic issue of credibility with witnesses who are contradicting themselves. Well, Your Honor, there's no evidence. And each other. There's no evidence that in 2012 that this witness ever said Flournoy. He said, I told the officers the correct house. I saw the house. He was driven out to the house. He said, I showed them the correct house at that time. In his sworn deposition, he kept saying Flournoy, and that's not Keillor. At the start of his deposition, he did. But again, at the time, he was actually driven out to the house. He identified the house in person at that time. He said at his depositions that he identified the correct house at that time. And he said, also, I don't know what houses look like. I can't tell the difference. And I was so dope sick that I didn't care. I wasn't paying attention. He said, I don't recall what the house itself looks like, but I bought drugs there multiple times in the vicinity of that house. I watched this drug dealer come out of that house, and I recognized that house by the dog pens that are in the back of the house. Everyone in the neighborhood knew, if you wanted to buy heroin, to go down to the house with the dog pens on that corner and that that's where I would go. Can we get agreement that the police did, in fact, go to the wrong house? I don't believe so. The officers continue to maintain that they went to the house that was identified by the informant, and the informant continues to maintain that he identified the correct house. The plaintiffs maintain that it was not the correct house. Can I ask you about the why do you believe the police did enough to corroborate the information from John Doe about purchasing the drugs at that location, and there actually being some independent indicia of criminal activity occurring at 827 South Keeler? Well, Your Honor, respectfully, this is a totality of the circumstances evaluation, and independent corroboration is only one prong of that totality. So where you have strong indicia of reliability on other prongs, such as firsthand knowledge, detailed descriptions of what occurred, of the recency of the transaction, all of those things weigh in favor of finding that this is a credible witness, regardless of an independent corroboration is simply one other factor. This Court has upheld— They did nothing on that prong, right? Nothing. That's true, Your Honor, but recently in Walker v. Weatherspoon, in very similar circumstances, this Court upheld a warrant where there was a first-time informant who told the police, I can bring you to where I buy heroin. I can't tell you the address, but I can identify the house in person. The police drove her there. She pointed out the house, and this Court said that was sufficient. You have a person who says, I firsthand participated in a criminal activity at this house, and without independently corroborating, that was sufficient. This Court said so, and this Court has said so in other cases as well, like Sims and Lake. It's a totality of the circumstances evaluation. We do slow down to—we do seem to have a problem with the amplification system. I apologize, Your Honor. I will try to be aware of that. You have to fight against the adrenaline. Sure. No, and it's true, Your Honor. That's correct. Also, we should emphasize again that this is a case where the issuing judge met with this informant, saw this informant, was told this informant is a heroin addict. He purchased heroin yesterday. He's admitted to statements against interest under oath to this judge and to the police, and the judge had the opportunity to personally evaluate the credibility and the condition of this informant. And that also weighs strongly in favor of reliability under that totality of the circumstances evaluation. So as to the other claim, the summary judgment was also proper on plaintiff's claim for unreasonable conduct of the search. The officers had no reason to abandon the search upon arrival at the house because it did not differ from the description of the house in the warrant complaint. There was no reason to believe also that a family home could not contain drugs, and, in fact, Officer Herrera testified to previous experience to that effect, and a dog when it swept through the house also alerted to the possible presence of drugs in various locations in the house. The officers also learned that Mr. Edwards had firearms that had to be located and checked for proper registration, and the only officer to ever express any doubt that this was the correct house was Officer Herrera, who did not have any doubts, he said, until he entered the basement to look for the guns towards the end of the search, and at that time he did not share any of his concerns with any of the other officers, including his supervisor or the officer who was responsible for the search. Who was the officer who made the bamboozled again comment? Excuse me? Who made the bamboozled again comment? The officers all denied having made that comment. Two of the plaintiffs testified that they overheard an officer say that we've been bamboozled again. So what happens, I gather from, I'm still trying to piece this together, but I gather that after this debacle of a search, Mr. Doe actually became a registered informant and was used again. Is that right? That's correct, Your Honor. He became a registered informant. Was his information being provided to judges for search warrants and with representations that he was reliable? Doe testified that he didn't participate in another search warrant, that he may have participated in providing information to officers that led to the arrest of a drug dealer at another location, but that he did not participate in any other search warrants. Okay. I would think, I guess I would hope that officers would find this incident in his record, where you're telling me the officers think they searched the right house, and I agree, based on their testimony, they think they did. But they can't think, can they, that Doe gave them accurate, reliable information? Well, they were told that there was a person at that house who was selling drugs out of the house. They could continue to believe that that person simply wasn't present at the time that they came to the house and searched the house. There is no reason to believe that that couldn't be the case. Can you address the qualified immunity issue? Certainly. The officers here, at a minimum, were entitled to qualified immunity because they acted in good faith reliant on a warrant and a warrant complaint that had been reviewed by an assistant state's attorney, a state court judge, and in the end the district court here. Do you need to rely on the warrant for this purpose? You have a federal district judge who concluded after full opportunity for litigation that there was probable cause. Absolutely, Your Honor. Every single independent evaluator who has looked at this warrant and this complaint determined there was probable cause. There was absolutely no reason that these officers could not in good faith rely on that warrant, and they should absolutely be qualifiedly immune from liability in this case. Also, because plaintiffs said that they will address the Monell claims, I'd like to briefly address that. In this Monell claim alleged that the CPD's warrant policies caused the officers to violate plaintiffs' Fourth Amendment rights. But judgment was due on the Monell claim here once the court had granted summary judgment on the underlying Fourth Amendment claims because plaintiffs could no longer demonstrate a constitutional injury that was caused by those alleged policies. So barring any further questions, for all these reasons, Your Honor, the defendants would respectfully ask this court to affirm the judgment below. Thank you. Thank you, Mr. Hooper. Anything further, Ms. Dykemaer? Yes, Your Honor, just briefly. First of all, just briefly about the RCI file. We didn't have access to that. We think that this man was established as a registered cooperating individual in order to hide his identity. The police knew this family was very angry, and so it's something that they produced afterwards. He didn't amount to anything before this search. He was wrong about the Edwards house, and he never helped the police after this point. Regarding what they should have told the judge, there was no corroboration of criminal activity, and there was no connection at all with anything. There's no connection between Fred Sutton and the house. He lived on Lexington Street. He had been arrested 30, 40 times, always getting that address. And when I showed the John Doe a picture of that Lexington Street address, he said, yeah, that's where Fred keeps his heroin. So they didn't make a connection with Fred Sutton. The house itself, he wasn't able to identify anything significant about the house, the John Doe. This is not like the Sims case or Johnson Jones Lake where there's descriptions of the interior, where there's a diagram drawn. This man didn't know what the house looked like, didn't know if it was wood, whether it was brick. He didn't know anything about the house. There is no connection with anything here. But I would like to talk just briefly about the Monell claim. This illustrates why Monell is so important. The John Doe changed his mind, excuse me, Joel Blake changed his mind as to who the John Doe was after he had signed two sets of responses to request to admit, two sets of interrogatories, and he sat through. Okay, thank you very much, Your Honor. The case is taken under advisement. Thank you.